## UNITED STATES v. BAKER et al.

No. 6250.

Circuit Court of Appeals, Ninth Circuit.

May 18, 1931.

Geo. J. Hatfield, U. S. Atty., and I. M. Peckham and Francis J. Perry, Asst. U. S. Attys., all of San Francisco, Cal.

Ramsey Probasco and Cyril W. McClean, both of Oakland, Cal., for appellees.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

 This is an appeal by the United States of America from a judgment entered against them in favor of appellees in the sum of $3,874.98, with interest from date until paid, in an action brought by appellees to recover moneys they claimed to be due them from appellant for additional work, labor, and material rendered and furnished by appellees to appellant under or in connection with a written contract between them entered into on September 23, 1927, which provided, among other things, for the construction of approximately 17,867 linear feet of masonry guard rail, or guard rail wall, between stations 0+00 and 359+00 on route 1–A, Yosemite National Park, Cal., for which the contractors were to be paid on the basis of $12.75 per cubic yard. The amount of said judgment was made up of two items: First, in the sum of $1,128.32, represented extra cost of furnishing 1,640 linear feet of granite, but the government does not hear complain of the allowance of said sum as a part of the judgment; second, in the sum of $2,746.66, represented the amount of extra cost of a change which, as the complaint alleged and the court found, was made by the government in the plans for the construction of said guard rail as originally provided for in the written contract. Upon the allowance by the trial court of the amount represented by said second item, the main controversy on this appeal arises.

To the allegations of appellees' complaint appellant interposed an answer consisting of a general denial of each and all of said allegations. On the trial, at the close of appellees' evidence, counsel for appellant, stating that the defense did not care to offer any evidence, moved for judgment on all of the issues in favor of the government; the principal ground being that a prima facie case had not been proved. The court denied said motion, and, upon motion of appellees' counsel therefor, rendered its order for judgment for appellant on special findings. Touching the controverted second item, the trial court found as follows:

"IV. That plaintiffs were required to construct 3,829 linear feet of additional wall not contemplated in the written contract aforesaid.

"That it was contemplated by the terms and provisions of the said written contract that said guard rail wall was to be carried, below the surface of the pavement, to an average depth of one foot for the entire length of the wall. That after the commencing of said work, a change in the depth of this wall was ordered by defendant's authorized representative, making its average depth approximately six inches beneath the surface of the pavement for the entire length of the wall. That this change in the plans materially increased the costs per cubic yard of constructing said masonry guard rail, as masonry which was substituted in the upper part of the wall for masonry laid in the footings of the wall was more expensive to construct. * * * That plaintiffs are entitled to additional compensation therefor in the sum of $2,746.66."

The principal errors assigned by appellant are that the trial court erred in making said finding No. IV and in not finding that the guard rail or wall, as built, was carried in every instance to the depth contemplated by the written agreement and that no change, by operation of law or otherwise, in plans or specifications thereof in reference to the required depth of said wall, was made by appellant or any of its agents, and that the trial court erred in making its conclusion of law that appellees are entitled to interest on the principal amount of the judgment.

From the record it appears that the written contract referred to was entered into upon the acceptance by the government of a bid theretofore submitted by appellees in compliance with the government's invitation for bids. The terms of appellees' bid proposed to furnish all labor and materials and perform all work required for constructing said masonry guard rail "in strict accordance with the specifications, schedules and drawings, for the consideration of the unit prices shown in the Bid Schedule." Accompanying said bid was a "bid proposal" covering four items, one of which was as follows: "No. 69." "Approximate Quantity, 3,400 Cu. Yds. Masonry Guard Rail at $12.75 per cu. yd., $43,500." Said contract provided, among other things, in article 1, that the contractor should furnish all labor and materials and perform all work required for the construction of said masonry guard rail, between the stations previously specified herein, "in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof and designated as follows: Plans of the work consisting of * * * two sheets of typical section for masonry guard rail. * * * Specifications for Forest Road Construction, F. R. 50, Revised 1927. Special Provisions, Unit prices carried by the bid."

In said "Special Provisions" it was among other things provided, in substance, that said

guard rail should be constructed, at places where directed by the engineer, who in the specifications for Forest Road construction was designated as the authorized representative of the contracting officer signing the contract on behalf of the government, "in conformity with the designs for type No. 1, Sec. A, as shown on the sheet of typical sections excepting at places where directed by the Engineer the alternate type composed of an upper section of approved stones laid in mortar and a foundation section of Class B concrete constructed in accordance with the alternate design for type No. 1, Sec. B, may be required. * * * The total length to be constructed is approximately 17,867 lin. ft. * * *"

One of the two sheets of typical sections above referred to, and which are attached to the contract, is designated "Type 1—Sec. A. Typical Masonry Guard Rail," and depicts the foot of said guard rail as extending below the contiguous ground surface "To Solid Footing." The other sheet, designated "Type 1—Sec. B. Typical Masonry Guard Rail (Alternate Design Using Concrete Base)," delineates the foot of such rail as extending below the contiguous ground surface to contact with a base, designated "Class 'B' Concrete," resting upon a portion of the subsurface which is designated "To Solid Footing." On neither of said typical section sheets is there shown the depth to which it was contemplated the guard rail was to extend below the surface. On the trial plaintiffs admitted that such depth is not shown and cannot be determined from the sheet entitled "Type 1—Sec. A." The guard rail was built and completed throughout in conformity with said "Type 1—Sec. A," and appellees do not claim that any change of plan occurred by reason of any direction or requirement of the engineer that any portion of the guard rail be constructed in accordance with the "alternate design Type 1—Sec. B." While the above-quoted portion of the special provisions specifies the approximate linear footage that was contemplated by the government at the time the contract was entered into, it is clear from provisions of the contract, hereinafter referred to, which reserved to the government the right to increase the quantities of the work to be performed, or to increase the length of the project, that the specification in the contract of the approximate linear footage was not final, but was subject to increase, at the option or election of the government. As regards any amount of cubic yardage that might be involved in

the performance of the contract work, the contract did not specify the total amount of such yardage, approximate or otherwise, which it was contemplated the guard rail would contain. Obviously, in view of all the provisions of the contract, the amount of this cubic yardage could not be determined· or specified, even approximately, until the government engineer should, in the exercise of the right and option given him by the contract, determine and direct, as the work progressed and the subsurface conditions were disclosed, whether the work should be performed either entirely in accordance with the plan designated Type 1—Sec. A, or partly in accordance with that plan and partly in accordance with the alternate design Type 1—Sec. B, which alternate plan, if resorted to, might involve an increase in the quantity of subsurface work and greater cubic yardage than would be involved in construction in accordance with the plan Type 1—Sec. A. In view, therefore, of the controlling provisions of the contract on this subject, the mere specification, in the itemized portion of appellees' bid, of an "approximate quantity" of "3,400 cu. yds. Masonry Guard Rail at $12.75 per cu. yd., $43,350.00" could not be taken as meaning that the 17,867 linear feet of guard rail to be constructed should contain, as is claimed by appellee, approximately 3,400 cubic yards of guard rail.

· The evidence further tended to show that, upon the signing of the contract, the contractors started the construction of the guard rail, and that it had been built for a length of some 13,000 or 14,000 feet, when, about the middle of January, 1928, the contractors were informed by the government engineer that they would be required to construct the guard rail beyond and in addition to the approximate 17,867 feet specified in the contract. In so informing the contractors, the engineer was acting pursuant to provisions previously herein referred to, which were contained in the specifications and "Special Provisions" forming parts of the contract. These provisions recited that "the amount of the funds programmed for the work on this project * * * is $63,500.00," and provided that, "in case the contract awarded for this work shall leave available any portion of the funds so programmed, the right is preserved to extend this contract to such extent as will absorb the funds so remaining available, either by increasing quantities of work to be performed or by increasing the length of the project beyond the termini as shown on the plans; provided that no such

extension shall be made which will exceed in amount 25 per cent of the original amount of the contract."

The work was completed by the contractors as directed by the engineer, but not without a protest by the former.

The first formal written statement of the grounds upon which the contractors based their protest and the claim for extra work which is alleged in paragraph V of the complaint was in a letter which they wrote to Mr. Sweetser under date of March 22, 1928, several days after completion of the entire contract work. In this letter, among other things, it was stated that "the wall as built, because of acceptable foundation condition, was not carried, except in special cases, to the depth contemplated or as shown on the original plans. An average saving of six inches in depth was made, covering a distance of 17,869 lineal feet. This amounted to some 650 cubic yards of masonry. This yardage, we were informed, was to be used in more wall and we were to be paid on the same basis of our bid price, namely, $12.75 per cubic yard. The change in plans added materially to the cost of this wall to us. Masonry laid in the upper part of the wall and which is more expensive to lay was substituted for wall laid in the bottom of a ditch. * * * Under Article 4 of Sheet 2, Construction Contract, we claim that latent conditions have been materially changed over the original plans and that therefore we should be reimbursed for this extra expenditure."

Article 4 of the contract provides: "Article 4. *Changed Conditions*—Should the contractor encounter, or the Government discover, during the progress of the work subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the drawings or indicated in the specifications, he shall at once, with the written approval of the head of the department or his representative, make such changes in the drawings and (or) specifications as he may find necessary, and any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted as provided in Article 3 of this contract."

Said Article 3 provides: "The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and (or) specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract * * * an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than $500 shall be ordered unless approved in writing by the head of the department or his duly authorized representative. * * * But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed."

In this connection it is pertinent to refer to another provision of the contract, embodied in a paragraph of the "Special Provisions," which is entitled "Method of Measurement and Basis of Payment," and which provides: "This work shall be measured in accordance with the dimensions shown on the plans, except where changes are ordered by the Engineer, and will be paid for at the unit prices bid per cubic yard for masonry guard rail complete in place. These prices shall be full compensation for all necessary excavation, backfilling, asphalt joint filler, supplying, hauling and placing all material and for labor, equipment, tools, and incidentals necessary to complete the work."

On the trial it was stipulated by counsel for the respective parties that the contractors built 21,698 feet of guard rail, for which they were paid on the basis of $12.75 per cubic yard. The total number of cubic yards in said 21,698 linear feet of guard rail was 3,523.53, being 123.53 yards in excess of the "approximate quantity" of 3,400 cubic yards itemized by the contractors in their bid. Mr. Baker testified that all of the extra wall was built within the terminal points designated in the contract; that is, between station 0+00 and station 359+00. He further testified: "What I say in reference to the additional wall, with respect to the depth we had to go, also applies to the wall that we had already built, but we had no claim against that because we had overlooked the fact that this condition had come up; it was only when he asked us to build more wall that we objected. The old wall actually cost us 15 per cent more than we had anticipated, as well as the new wall. * * * After we had built 13,000 or 14,000 feet, we realized that we were losing a good deal of money because of this changed condition, but we had made no protest, we waive all claim on any

extra work on that. * * * We really had as good a claim on that first 17,000 feet as we did on this latter part, but we had gone and completed the wall without any protest, and we allowed it to stand."

It thus appears that not until plaintiffs were told they would be called on, under the terms of the contract, to build additional wall at the contract price, did they put forward their claim that the building of the wall at the lessened depth was a breach of their contract.

██ The foregoing review of the evidence, oral and documentary, has been made somewhat full because we are of the opinion that it clearly refutes the contentions of appellees to the effect that a material change, or any change, was made in the written contract that was entered into between the parties, and shows that all the steps that were taken by the government engineer in directing the character and extent of the guard rail construction were in strict accordance with the provisions of the contract, which plainly anticipated and provided for all of the steps so taken, with the result that no change or modification was made in the terms of the contract or in the work that was to be performed thereunder. Equally inapplicable, in view of this evidence, are the authorities cited by appellees, which are cases upholding claims for extra work or alterations not provided for in the contract, and performed, with the knowledge and assent of the party entitled to performance, without compliance with contract provisions that no such work or alterations should be performed without a written order by the owner or some authorized person acting in his behalf, or cases involving misrepresentation as to the conditions of the work to be performed. In the case at bar the evidence shows that no such conditions existed or arose under or in connection with the performance of the contract work. Here the contract provided, in substance, that the contractor should furnish all labor and materials and perform all work required for the construction of the masonry guard rail between specified stations, "in strict accordance with the specifications, schedules and drawings, all of which are made a part hereof and designated as follows: Plans of the work consisting of * * * two sheets of typical section for masonry guard rail. * * * Specifications for Forest Road Construction. * * * Revised 1927. Special Provisions. Unit prices carried by the bid." In said "Special Provisions" it was, in substance, provided that said guard rail should be constructed at places where directed by the government engineer, and "in conformity with the designs for type No. 1—Sec. A as shown on the sheet of typical sections," excepting at places where the government engineer might require the type shown on the sheet of typical sections designated "Type 1—Sec. B * * * (alternate design using concrete base)," a design which did not specify any depth of guard rail footing, and which was not at any time directed or required by the engineer in the performance of the contract work, which was directed, conducted, and performed throughout in accordance with said typical section "Type No. 1—Sec. A," a plan which, as plaintiffs admitted on the trial, did not show how deep they would have to go to reach the "Solid Footing" delineated thereon. Manifestly, in the circumstances here shown, the fact that, in bidding on masonry guard rail to be constructed in accordance with a plan or plans indicating no depth of footing, the bidders specified 3,400 cubic yards as the "approximate quantity" of cubic yardage covered by the bid could not be construed as implying a representation by the government that the 17,867 linear feet which was contemplated as the length to which the guard rail should be originally constructed should contain 3,400 cubic yards, requiring, relative to the length named, as the contractors claimed, an average footing of about one foot. Such an implication would not only be inherently unreasonable, but would go flatly counter to the above-mentioned provision to the effect that the guard rail should be constructed at places where directed by the government engineer and "in conformity with the designs for Type 1—Sec. A," which design, admittedly specifying no depth of footing, clearly left it within the power and discretion of the government engineer to direct at all places the depth of the guard rail footing, as required by the character of the surface and subsurface conditions disclosed as the work progressed, and unlimited by any arbitrary restriction which would require that such depth should average approximately a foot, regardless of what conditions the prosecution of the work might reveal. Clearly the specification in the bid of "approximate quantity" of cubic yardage, together with the price unit or price per cubic yard, was required primarily for the purpose of fixing a limitation upon the total or maximum amount of the work proposed to be performed under the bid if accepted, and keeping the cost of such work within the limits of the governmental program, and for kindred pur-

poses. To hold that the specification of "approximate quantity" of cubic yardage in the bid submitted by the contractors and accepted by the government constituted a representation or warranty on its part that the footing of the guard rail should throughout be of such average depth that the approximate 17,867 linear feet of constructed guard rail originally contemplated in the contract should contain an approximate total of 3,400 cubic yards, and that any additional linear footage of guard rail that should be constructed pursuant to the contract should be of the same average depth, regardless of physical conditions disclosed as the work progressed, would be to disregard the clear provisions and purposes of the government, as expressed or clearly implied in the contract, and to make them subordinate to the interest and profit of the contractor.

Appellees cite and quote from the case of Sartoris v. Utah Construction Co. et al., 21 F.(2d) 1, 2, decided by this court in 1927, certiorari denied by the Supreme Court 278 U. S. 651, 49 S. Ct. 176, 73 L. Ed. 562, as supporting the judgment rendered by the trial court herein. Two salient features of the Sartoris Case sharply distinguish it from the case at bar and render it inapplicable here. That case involved a claim for extra work done pursuant to a contract for the excavation of a tunnel for a railroad company, plaintiff, a subcontractor, claiming that said extra work was not within the specifications under which his contract was entered into. There the tunnel specifications originally furnished by the railroad company stated that "part of the tunnel excavation at each end is expected to be in earth formation, and the remainder in solid rock, with possibly a short distance in loose rock, or a combination of all three." In the early progress of the work, however, plaintiff encountered a formation of unusually fine loose sand which turned out to be continuous along the line of the tunnel for most of the way. Following a conference on the ground between the chief engineer and two other engineers for the railroad company and plaintiff, new specifications were prepared by the railroad company and given to plaintiff, pursuant to which he prosecuted the work to completion. Under these specifications the concrete lining was made thicker, the tunnel bore was correspondingly enlarged, and very much more extensive timbering was required, most of which was left in the structure. Plaintiff was paid extra for the additional concrete only, and by his action sought to recover the reasonable cost of the extra tunnel excavation and timbering required by the new specifications. This court held, in substance, that the language above quoted from the specifications was to be taken as a representation or assurance on the part of the railroad company, upon which plaintiff had the right to rely; that the only conceivable purpose of inserting the statement must have been to influence bidders and affect bids, and that it was equivalent to saying to prospective bidders or contractors that in submitting bids and in contracting they might assume that part of the tunnel excavation would be in earth formation, and the remainder would be in solid rock, with possibly a short distance in loose rock, or a combination of all three, and that, by referring to the accompanying drawings, they would see that the design is suited to such, and only such, formation; that, so read, the language constituted a waranty; that the plans having been changed by the railroad company, and work thereunder having been done by the subcontractor under the direction and approval of the railroad company, and with knowledge for some time that the subcontractor was expecting pay thereunder, the subcontractor was entitled to recover therefor on the theory of implied contract; there being radical changes in construction the necessary additional cost of which would be very great, as all must have realized.

In the case at bar there was nothing in the bid or in the contract which could be taken as a representation or assurance on the part of the government as to the depth, or the average depth, to which the guard rail was to be constructed. That matter was left entirely open. No depth whatever was indicated in the contract, or in the typical section sheets or plans or the specifications of the "Special Provisions" forming a part of the contract. From that portion of the "Special Provisions" which provided that the "guard rail shall be constructed at places where directed by the engineer," and from the large measure of direction, control, and discretion which other contract provisions conferred upon the engineer, bidders and contractors must be taken to have been clearly apprized that the depth of guard rail footings would be an uncertain and possibly a variable element, as it would of course be dependent upon the character of surface and subsurface conditions at the places which the government engineer had the right and discretion to select and designate as the places where the guard rail was to be constructed. Intending bidders, of course, had the opportunity, and in this case it was availed of **by**

appellees, to visit the designated location of the proposed work, and, from an inspection of the ground, obtain a knowledge of its general nature and of the probable character of the subsurface within the designated limits of the work; and in making their bid and entering into the contract it was of course incumbent upon them to take into account whatever uncertainty existed as to the varying conditions of surface and subsurface that might be encountered in constructing the guard rail at the places designated by the engineer. In addition to the absence of any representation in this case as to what the subsurface conditions were, another distinguishing feature of this case is that here no new plans or specifications were prepared; the guard rail being constructed throughout "in conformity with the designs for Type No. 1—Sec. A," no complaint whatever being made that the government engineer did not exercise the right or option given him to require that any portions of the guard rail should be constructed "in accordance with the alternate design for Type No. 1—Sec. B," which would apparently have called for a greater quantity of the undersurface work which, the contractors testified, would have been more profitable than was the proportion of the work that was done above ground. As construction work progressed to completion, it was found that all of it could be performed in conformity with said design for "Type No. 1—Sec. A," with an average footing depth of about six inches. In the circumstances here shown, to hold that, because the contractors were disappointed in their estimate or conjecture that the average footing depth would be about one foot, they are entitled to be compensated for the loss arising from their failure to forecast clearly indicated probabilities involved in the doing of the work would be to disregard the plain provisions of the contract.

The foregoing discussion of the salient features of the present case renders unnecessary a discussion of the cases cited by appellees, which involve features of departure from original contract provisions which are wholly absent from this case.

■ There remains for consideration the contention of appellant that the trial court erred in making its conclusions of law that plaintiffs are entitled to interest on the principal amount of the judgment. The determination of this question affects that part of the amount of the judgment which covers the allowance of $1,128.32, representing extra cost of furnishing 1,640 feet of granite, being the first item of plaintiffs' claims. Aside from the general contention that appellees are entitled to an affirmance of the judgment appealed from in the sum of $3,874.98, the full amount thereof, appellees make no answer to the contention of appellant that the allowance of interest on the amount of the judgment from its date was erroneous.

The decisions of the Supreme Court fully support this contention. In Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299, at page 304, 43 S. Ct. 354, 355, 67 L. Ed. 664, the Supreme Court said: "The rule is that, in the absence of a stipulation to pay interest or a statute allowing it, none can be recovered against the United States upon unpaid accounts or claims. United States v. Rogers, 255 U. S. 163, 169, 41 S. Ct. 281, 65 L. Ed. 566; United States v. North American Transportation & Trading Co., 253 U. S. 330, 40 S. Ct. 518, 64 L. Ed. 935; United States v. North Carolina, 136 U. S. 211, 216, 10 S. Ct. 920, 34 L. Ed. 336; Angarica v. Bayard, 127 U. S. 251, 260, 8 S. Ct. 1156, 32 L. Ed. 159; Harvey v. United States, 113 U. S. 243, 5 S. Ct. 465, 28 L. Ed. 987."

Again, Boston Sand Co. v. United States, 278 U. S. 41, 47, 49 S. Ct. 52, 53, 73 L. Ed. 170, citing the case from which the above quotation is taken, refers to "the rule that the United States is not liable to interest except where it assumes the liability by contract or by the express words of a statute, or must pay it as part of the just compensation required by the Constitution."

In the instant case there is no provision of statute or contract stipulation calling for the allowance of interest on the claim presented by appellees, and that part of the judgment which allows interest on the amount of the judgment from the date of the judgment until paid was erroneous and should have been omitted.

The judgment appealed from is reversed, except as to the portion thereof which represents the sum of $1,128.32, the amount of appellees' claim upon item 1 concerning the allowance of which amount the government does not here complain; and the trial court is directed to vacate the judgment as entered and to enter judgment in favor of appellees for said sum of $1,128.32, without provision for the allowance of interest on said amount.

WILBUR, Circuit Judge, concurs.